IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

IN THE MATTER OF:                          )
                                           )
PARADISE PARK, INC.,                       )
                                           )          CASE NO. BK11-80449
                    Debtor(s).             )                A13-8044
CITY OF BELLEVUE, NEBRASKA,                )
                                           )
                    Plaintiff,             )          CHAPTER 11
                                           )
          vs.                              )
                                           )
PARADISE PARK, INC. and                    )
HOWARD HELM,                               )
                                           )
                    Defendants.            )

FINDINGS AND RECOMMENDATIONS
TO THE UNITED STATES DISTRICT COURT

      Trial was held in Omaha, Nebraska, on May 20, 2014, on the plaintiff's complaint. Roger P. Cox appeared for the plaintiff. Defendant Howard Helm appeared pro se. No appearance was made for defendant Paradise Park, Inc.

I. Background and Procedural History

      Paradise Park, Inc. ("PPI") owns real estate in Sarpy County, Nebraska, on which it has developed a modular home community called Paradise Park. Its primary business is the development and leasing of residential real estate lots and the leasing of single-family residential lots to the owners of modular homes. PPI also has a storage business and an auto body/repair business. Howard Helm is the majority shareholder and an officer of PPI. The City of Bellevue approached Mr. Helm in 2007 about purchasing a tract of PPI's property (referred to hereafter as "Lot 3") to use for the expansion of a sanitary lift station. The parties negotiated location and certain terms, and on October 8, 2007, executed an agreement ("the 2007 agreement") by which the owner[1] agreed to convey by warranty deed the tract upon which the lift station was to be constructed. The agreement contained an estimated square footage of 6,650 and a price of $1.10 per square foot. The parties also agreed on the conveyance of easements to the City of Bellevue for the construction, operation, and maintenance of the station, at a price of 55 cents per square foot, the modification of a permanent access

---

[1]In this agreement, the owner is identified as "Howard Helm, and/or Paradise Park, Inc. (collectively, "Owner"), whichever is the owner of Lot 3, Paradise Park[.]" At trial, Mr. Helm clarified that at the time of this agreement and thereafter, PPI owned Lot 3 and his involvement was only as president of PPI.

agreement, and the release of unnecessary existing easements. The City of Bellevue also agreed to erect a fence around the station and install a roof and external coating on the new addition to match the existing station and hide certain equipment. In addition, the City of Bellevue agreed to reimburse the owner for a portion of the cost of engineering and survey work for the tract. Finally, the City of Bellevue agreed to construct a paved street to (and a bit beyond) the lift station, adjust any utilities affected by the pavement construction, and connect sanitary sewer service to two lots affected by the construction. The agreement called for the street construction to meet minimum design standards with the exception that the minimum pavement thickness would be eight inches to match the existing pavement in the subdivision. The agreement notably does not contain any terms pertaining to the time for its performance.

In January 2009, after further survey and engineering work, the parties entered into a letter agreement which adjusted the terms of their agreement to increase the square footage to be acquired for the project from 6,650 to 7,200, and for the easements from 38,255 to 46,031. The owner also agreed to grant the City of Bellevue a temporary construction easement of 20,792 square feet at 27.5 cents per square foot. The area of the current unnecessary easement to be vacated was increased from 35,621 square feet to 39,518 square feet. The City of Bellevue also agreed to provide the owner with construction drawings to show plan revisions made during construction, as well as required test results, including soil compaction tests, pressure tests, bacteriological tests, and concrete pavement tests. In addition, the City of Bellevue agreed to reimburse the owner an additional $4,000.00 for revised plat plans and design improvement plans. Finally, the City of Bellevue agreed to indemnify the owner and its agents and employees from any claims, damages, losses, and expenses arising from the City of Bellevue's performance under the contract, any breach or default by the City of Bellevue, any act, error, omission, or negligence by the City of Bellevue or anyone acting on its behalf, and material misrepresentation by the City of Bellevue, or from the City of Bellevue's operations in or about the project site.

On March 12, 2009, PPI and the City of Bellevue executed a "Sale and Purchase Agreement" for the property, a portion of Lot 3 containing 7,200 square feet more or less. The agreement is for the sale of the tract as-is for $7,920.00 with closing to occur at a time mutually agreeable to the buyer and seller after the title examination had been performed and any objections noted and cured or waived. This agreement dealt only with the transfer of the property; it contains no language concerning any conditions of the sale. Notably, PPI's obligation under the purchase agreement is not contingent on the City of Bellevue's performance of its obligation to install the street to the specifications discussed by the parties and memorialized in the 2007 agreement.

The City of Bellevue paid PPI $62,954.85 in February 2009 for the property purchase and easements, landscaping, and engineering, pursuant to the various agreements, but PPI did not deed the property to the City of Bellevue. PPI asserted the City of Bellevue had not complied with its obligation regarding the construction of the street to the lift station, specifically noting that the new curbs did not match the curbs on the subdivision's existing streets and questioning whether the new street was built to specification. Mr. Helm on behalf of PPI wrote to the City of Bellevue about the issue in January 2010, which caused a statutory contractual claim proceeding to be initiated before

-2-

the Bellevue City Council. The council conducted a hearing in March 2010 and denied the claim the following month. Mr. Helm and PPI then filed a lawsuit against the City of Bellevue in Sarpy County District Court in July 2010. Because the City of Bellevue was not served with process and Mr. Helm and PPI did not take steps to move the case forward, the court dismissed it in April 2011.

PPI filed a Chapter 11 bankruptcy petition on February 28, 2011. It listed Lot 3 among its real estate assets. The Paradise Park lots were subject to deeds of trust held by Great Western Bank, its largest creditor. The agreements with the City of Bellevue were not listed among the debtor's executory contracts, nor was the City of Bellevue listed as a creditor. The confirmed plan of reorganization does not incorporate or address any claim held by the City of Bellevue. The bankruptcy court entered a final decree recognizing that the case had been fully administered and closed the case in June 2012. It became clear during the present lawsuit that the City of Bellevue never received notice of or an opportunity to participate in the bankruptcy case.

In an effort to obtain ownership and possession of Lot 3, the City of Bellevue filed a lawsuit in Sarpy County District Court on October 8, 2012, against PPI and Mr. Helm, alleging breach of contract and seeking specific performance or quiet title. The City of Bellevue's first claim for relief is based on the 2007 agreement, asserting that all of the conditions required for the defendants to convey title to the subject property had occurred but the defendants nevertheless refuse to execute the warranty deed, so the City of Bellevue requests an order requiring specific performance of the conveyance of the property, the execution and delivery of a warranty deed, and a declaration that if the defendants do not convey the real estate, then all right, title, and interest in the property shall be deemed vested in the City of Bellevue and title to the property shall be quieted in the City of Bellevue. The second claim for relief is based on the March 2009 sale and purchase agreement, with the City of Bellevue alleging that all of the conditions precedent to the defendants' obligation to convey title had occurred but the defendants nevertheless refuse to execute the warranty deed, so the City of Bellevue requests an order requiring specific performance of the agreement by conveyance of the property, the execution and delivery of a warranty deed, and a declaration that if the defendants do not comply, then all right, title, and interest in the property shall be deemed vested in the City of Bellevue and title to the property shall be quieted in the City of Bellevue.

Due to the fact that the bankruptcy case had been filed by PPI, Mr. Helm and PPI removed the lawsuit to federal district court in April 2013 and subsequently filed an answer denying the substantive allegations in the complaint and raising the bankruptcy case and the confirmation of PPI's plan of reorganization as defenses. Specifically, the defendants argued that all claims of unsecured creditors are dealt with by the terms of the plan; all executory contracts which PPI did not explicitly assume were rejected by the terms of the plan; the plan is binding on all creditors and parties in interest; and any recovery is barred by the doctrines of laches, collateral estoppel, and/or preclusion.[2]

The City of Bellevue became aware of the bankruptcy case when it received the defendants' answer. The defendants then filed a suggestion of bankruptcy and in July 2013 the district court

---

[2]The laches, estoppel, and preclusion arguments appear to have been abandoned.

referred the matter to this court for all further proceedings, pursuant to the district's general rules. The case was docketed as an adversary proceeding related to PPI's bankruptcy case, and, as is standard operating procedure when this court receives the referral of a district court case, an order was entered directing the parties to file status reports. In particular, the parties' status reports in this case were expected to assist the court by "explaining how the bankruptcy case affected the plaintiff's claim and whether the claim has been discharged by operation of the Bankruptcy Code." Fil. No. 2. After reviewing the parties' status reports, the court opted to retain the case rather than asking the district court to withdraw the reference, observing several bankruptcy-specific legal issues that needed to be determined before the merits of the case could be addressed. The order stated:

> The court notes that the debtor's amended plan of reorganization contains a provision addressing the bankruptcy court's retention of exclusive jurisdiction to deal with, *inter alia*, plan interpretation and disputes arising from the assumption or rejection of executory contracts. *See* ¶¶ 10.1 and 10.2 of Paradise Park, Inc.'s Amended Plan of Reorganization (Fil. No. 179 in Case No. BK11-80449). In addition, these bankruptcy issues need to be resolved before this or any other court can address the merits of the lawsuit. Therefore, it is appropriate for this court to retain jurisdiction of the lawsuit at this time.

> The parties, directly or indirectly, raise several factual and legal issues to be dealt with. Some that are readily apparent include the notice, if any, and opportunity to participate given to the City of Bellevue with regard to the bankruptcy case. Related to that is the effect of the debtor's failure to list the City as a creditor. Another issue is the interpretation of the seemingly contradictory language used in the plan provisions dealing with the assumption or rejection of executory contracts. *See* ¶¶ 8.1 (providing that all leases and executory contracts will be assumed) and 8.2 (providing that all leases and executory contracts will be deemed rejected if not assumed). Before that plan language can even be applied, a determination needs to be made as to whether the agreements at issue are, in fact, executory contracts and what effect the failure to list them as such in the bankruptcy schedules had. . . .

> The parties will be given an opportunity to conduct any necessary discovery on these and other issues, and the case will progress as to these preliminary matters. After resolution of the bankruptcy-specific issues, the court will revisit the parties' positions as to the appropriate forum for a determination of the merits of the case.

Fil. No. 17 at 1-2.

The court then ordered the parties to submit a joint preliminary pretrial statement on the issues identified in the order at Fil. No. 17. At the time, both defendants were represented by counsel. Before the pretrial statement was due, defendants' counsel was permitted to withdraw from the case and the parties were given an additional month to file the pretrial statement. The City of Bellevue timely filed a pretrial statement of its own because the defendants would not participate in the

preparation of a joint document. After another order from the court, Mr. Helm filed a pretrial statement.

According to their respective pretrial statements, the City of Bellevue considers this a straightforward breach of contract action for the defendants' failure to comply with the 2007 and March 2009 agreements. The defenses raised by the defendants include the City of Bellevue's failure to perform under the contracts, the contention that both contracts are executory contracts which were rejected by the terms of the confirmed Chapter 11 plan, and the assertion that whatever claim the City of Bellevue may have held was discharged in the bankruptcy. On the basis of the arguments raised in the status reports and pretrial statements, the court scheduled the complaint for trial.

At the trial, evidence was admitted and testimony was heard from two witnesses for the City of Bellevue and from Mr. Helm on his own behalf. The matter was then taken under advisement.

A threshold issue to be addressed by bankruptcy courts in every case post-*Stern* is the matter of this court's authority to enter final judgment. The United States Supreme Court emphasized in *Stern v. Marshall*, __ U.S. __, 131 S. Ct. 2594 (2011), that if an action neither stems from the bankruptcy itself nor would necessarily be resolved in the claims allowance process, the bankruptcy court lacks constitutional authority to enter final judgment. This is based on the Supreme Court's line of jurisdictional cases arising from the Bankruptcy Reform Act of 1978, most notably *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), and *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989):

> The *Stern* court emphasized a point made in *Marathon*: as Article I courts, bankruptcy courts may not enter final judgments in non-bankruptcy matters that are based on the common law or state law. *Stern*, 131 S .Ct. at 2609. Consistent with separation of powers principles, the majority impressed that "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" *Id.* (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284, 15 L. Ed. 372 (1856); *Marathon*, 458 U.S. at 70 n.25, 102 S. Ct. 2858 ("What clearly remains subject to Art. III are all private adjudications in federal courts within the States – matters from their nature subject to 'a suit at common law or in equity or admiralty' . . .")). Article III protects a constellation of judicial power, specifically "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," from encroachment by the other branches. *Id.* at 2609 (quoting *Marathon*, 458 U.S. at 90, 102 S. Ct . 2858 (Rehnquist, J., concurring)). Bankruptcy courts, as non-Article III tribunals, therefore lack constitutional authority to finally adjudicate state-created private rights. *Id.* at 2620; *see also Marathon*, 458 U.S. at 71, 102 S. Ct. 2858 ("the restructuring of debtor-creditor relations . . . must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case.").

*Burns v. Dennis (In re Se. Materials, Inc.)*, 467 B.R. 337, 347-48 (Bankr. M.D.N.C. 2012).

      The underlying lawsuit here is a basic contract dispute. It does not involve federal law; rather, it is an adjudication of private rights unrelated to any restructuring of debtor-creditor rights. Because this is a non-bankruptcy matter based on common law or state law, the bankruptcy court lacks constitutional authority to enter final judgment. For that reason, these findings and recommendations are being submitted to the district court for entry of judgment as appropriate. The effect of PPI's bankruptcy case on the merits of this case will be discussed below, to provide guidance to the district court. The findings and recommendations as to each defendant are set out separately below.

## II.  Paradise Park, Inc.

      PPI has been unrepresented by counsel in this matter since October 14, 2013. It has not filed any documents in response to various court orders since that time. No counsel appeared on its behalf at trial. "It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel." *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201–02 (1993) (citing *Osborn v. President of Bank of United States*, 9 Wheat. 738, 829, 6 L. Ed. 204 (1824) and *Turner v. American Bar Assn.*, 407 F. Supp. 451, 476 (N.D. Tex. 1975) (citing the "long line of cases" from 1824 to the present holding that a corporation may only be represented by licensed counsel), *affirmance order sub nom. Taylor v. Montgomery*, 539 F.2d 715 (Table) (7th Cir. 1976), and *aff'd sub nom. Pilla v. American Bar Assn.*, 542 F.2d 56 (8th Cir. 1976))).

      "One of the justifications for requiring that corporations be represented by counsel [is] 'the "lay litigant" lacks many of the attorney's ethical responsibilities.'" *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 192 (2d Cir. 2006) (quoting *Grace v. Rosenstock*, No. 85–cv–2039, at 13 (E.D.N.Y. Oct. 4, 2004) (quoting *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983))). "Attorneys do not exist merely to act as information conduits or to communicate with opposing counsel. Rather, they inform, advise, counsel, explain matters of law, and do much more. . . . Even the sole shareholder of a corporation is differently situated legally from the corporation, whose interests '"frequently overlap but are not identical in all respects."'" *Id.* (quoting *Grace v. Rosenstock*, No. 85–cv–2039, at 13 (E.D.N.Y. Oct. 4, 2004) (quoting *Batac Dev. Corp. v. B & R Consultants, Inc.*, 2000 WL 307400, at *2 (S.D.N.Y. March 23, 2000))).

      In addition to having no legal representation and not appearing at trial, PPI has not presented any evidence that it provided formal notice of its bankruptcy case to the City of Bellevue or that the City of Bellevue had adequate actual notice of the bankruptcy in time to protect its rights under the parties' contracts. Because PPI has not defended itself in this case, default judgment should be entered against it on the City of Bellevue's claims for quiet title and specific performance. Fed. R. Bankr. P. 7055; Fed. R. Civ. P. 55.

      While this lawsuit involves a straightforward breach of contract, the existence of the bankruptcy case and the effect of bankruptcy law on the rights of the respective parties requires

further explication. The two bankruptcy concepts relevant to this case are discharge and the treatment of executory contracts. Each will be discussed in turn.

A.    Discharge

The goal of bankruptcy debtors is to obtain a court-sanctioned discharge of their pre-petition debts. "A 'discharge' . . . is a statutory construct and a bankruptcy law term of art . . . [which] refers to a form of relief that permanently enjoins attempts to collect debts of a debtor by creditors of that debtor." *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 516 (Bankr. E.D. Mo. 2012). The purpose of most Chapter 11 cases is to provide a debtor with the time and space necessary to formulate a strategy to reorganize or restructure and emerge as a viable ongoing enterprise. To that end, a debtor prepares a plan of reorganization setting forth how it intends to obtain financing, continue business operations, and deal with its existing obligations. Creditors are given an opportunity to evaluate the plan and vote on whether it should be implemented. If the plan meets certain statutory requirements, and any objections by creditors or interested parties are resolved, the court enters an order confirming the plan. With certain exceptions, the confirmation of a plan of reorganization discharges the debtor from liability on any debts arising prior to the date the plan was confirmed. 11 U.S.C. § 1141(d)(1).

In this case, PPI, with the acquiescence of its primary creditor, Great Western Bank, developed a plan by which it proposed to restructure the terms of Great Western Bank's loans and make monthly payments for two years with a balloon payment of all unpaid principal, accrued interest, and other charges due on December 15, 2013. Unsecured claims would be paid pro rata on a quarterly basis if funds were available, after making the monthly payment to Great Western Bank, until they were paid in full. The court approved the plan and entered an order of confirmation on January 25, 2012. The plan was subsequently modified to reamortize the payment of Great Western Bank's claim after Great Western Bank's attorney fees were allowed and added to the claim. PPI continued to make its payments under the plan and obtained a final decree closing the case. When PPI's plan was confirmed, its liability for pre-confirmation debts and obligations was discharged.[3]

The Bankruptcy Code makes clear that the terms of a confirmed plan create a new contract between the debtor and its creditors by which the parties are bound:

> [T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

---

[3]The court's order after reviewing the parties' status reports (Fil. No. 17, at 2) contained a statement that PPI "did not and will not receive a discharge[.]" That language, regrettably, was incorrect, based on a misapprehension of the record of the bankruptcy court case. Under the terms of the Bankruptcy Code, PPI was eligible for and did receive a bankruptcy discharge.

11 U.S.C.§ 1141(a).

The binding contract created by a confirmed plan means claims[4] that arise prior to the court's confirmation of a plan of reorganization but are not dealt with in the plan cannot be collected. However, due process considerations trump this blanket provision. A confirmation order cannot act to discharge and enjoin a claim unless the claimant has received adequate notice of the bankruptcy proceeding and of any claims bar dates fixed therein. *In re Pettibone Corp.*, 162 B.R. 791, 808 (Bankr. N.D. Ill. 1994). *See also In re CareMatrix Corp.*, 306 B.R. 478, 486 (Bankr. D. Del. 2004) ("[W]hen a creditor does not receive adequate notice, the creditor is not bound by the confirmation order.") and *Reliable Elec. Co. v. Olson Constr. Co.*, 726 F.2d 620, 623 (10th Cir. 1984) ("[N]otwithstanding the language of section 1141, the discharge of a claim without reasonable notice of the confirmation hearing is violative of the [F]ifth [A]mendment to the United States Constitution," citing *New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293, 297 (1953) and *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)).

Here, the City of Bellevue did not receive any formal notice of the filing of the bankruptcy case, the proposed plan, or the opportunity to file a claim and vote on the plan. There is no evidence it was aware of the bankruptcy case until the defendants referred to it in their answer of May 31, 2013. Therefore, it is not bound by the discharge of PPI's debts and retains its pre-petition rights against the debtor, including the right to pursue a breach of contract action. *In re St. James Mech., Inc.*, 434 B.R. 54, 63 (Bankr. E.D.N.Y. 2010).

B.      Executory Contracts

An executory contract is "'a contract under which the obligation of both the [debtor] and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.'" *Kaler v. Craig (In re Craig)*, 144 F.3d 593, 596 (8th Cir. 1998) (quoting *Northwest Airlines, Inc. v. Klinger ( In re Knutson)*, 563 F.2d 916, 917 (8th Cir. 1977) (quoting V. Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973))).

---

[4]Under the Bankruptcy Code, the term "claim" means

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

Here, the contracts with the City of Bellevue do not appear to be executory contracts. The debtor did not list any contract with the City of Bellevue as an executory contract in its bankruptcy schedules. Moreover, the City of Bellevue paid the amount it agreed to pay and installed the paved street as required in the 2007 agreement. Mr. Helm believes the street curbs violate the agreement and therefore that obligation remains outstanding on the part of the City of Bellevue. Certainly a difference of opinion exists as to whether the curbs comply with the contractual requirement,[5] but the City of Bellevue did install the street and curbs. PPI may have a claim for damages, but it would be a stretch to say that the dispute over the curbs would constitute a material breach excusing the performance of Mr. Helm and PPI. Further, Mr. Helm initiated an administrative proceeding with the City of Bellevue regarding the curbs on behalf of PPI, was unsuccessful, and did not pursue his remedies further.

In any event, the obligation of PPI to convey the property to the City of Bellevue was bifurcated from the 2007 agreement by virtue of the 2009 sale and purchase agreement. That 2009 agreement cannot be executory because it pertained only to the delivery of the warranty deed in exchange for the purchase price paid by the City of Bellevue. It did not contain any terms regarding the street construction. The City of Bellevue had already made the contractually required payment to PPI before the purchase agreement was executed, so the only performance required was by PPI. In other words, it clearly was not an executory contract because only PPI's obligations under the 2009 agreement remained unperformed when the bankruptcy case was filed.

Even if the contracts with the City of Bellevue were to qualify as executory contracts, the debtor's confirmed plan provides that "[a]ny executory contracts or leases that have not been expressly assumed or rejected prior to sixty (60) days from and after the Effective Date shall be deemed rejected on the sixty-first (61st) day after the Effective Date[.]" Amd. Plan ¶ 8.2 (Fil. No. 179 in Case No. BK11-80449). The agreements at issue here were not expressly assumed, so they are deemed rejected under the terms of the plan. Such rejection constitutes a breach of the contract, 11 U.S.C. § 365(g)(1), so the City of Bellevue may exercise whatever rights and remedies it has with regard to that breach.

C.    Collateral Estoppel/Res Judicata

The City of Bellevue argues that the defendants are precluded from asserting that the City of Bellevue failed to perform its contractual obligations by the Bellevue City Council's rejection of that position at the 2010 statutory claim hearing. Soon after the construction of the street, the defendants raised their concerns about the quality of the paving and curb work with the public works director,

---

[5]Clearly, the curbs installed by the City of Bellevue on its portion of the road do not match the curbs previously installed by PPI on the adjacent road. It is unfortunate that the engineers did not catch the discrepancy prior to or during construction by the City of Bellevue's contractors. It is also unfortunate that the City of Bellevue was not able to reach an agreement with PPI on a remedy. However, curbs are not mentioned in the 2007 agreement and the road construction is not mentioned at all in the 2009 agreement.

who did not have the authority to handle the matter to Mr. Helm's satisfaction. Mr. Helm then wrote to the city clerk in order to attempt to obtain relief from the city council. The letter was treated as a non-tort claim against the City of Bellevue and the statutory requirements for formal consideration of the claim were instituted. Neb. Rev. Stat. § 16-726. The council held a public hearing, deliberated, and voted to disallow the claim consistent with its untimely filing and the lack of evidence to support it. The defendants did not appeal the decision, which is now final.

The denial of a claim in an administrative proceeding before a city council precludes a subsequent court action to recover a claim based on the same facts. *L.J. Vontz Constr. Co. v. City of Alliance*, 500 N.W.2d 173, 179 (Neb. 1993).

> [A] claim before a tribunal, be it an administrative agency or a municipal board, once decided and not appealed from, or if appealed and the appeal is dismissed, is res judicata and may not, as a general rule, be relitigated. *See, generally*, *In re Estate of Marsh*, 145 Neb. 559, 17 N.W.2d 471 (1945). "An unreviewed administrative hearing can preclude later litigation of the same issues." *Scott v. Mattingly*, 241 Neb. 276, 281, 488 N.W.2d 349, 351-52 (1992).

*Id.*

Therefore, the defendants may not continue to raise their arguments about the City of Bellevue's construction of the street in any future litigation on these contracts.

### III.  Howard Helm

At trial, Mr. Helm made clear that he does not own Lot 3 and participated in the contractual negotiations only as PPI's president. The City of Bellevue confirmed that it named Mr. Helm as a defendant merely out of an abundance of caution as the 2007 agreement raised the possibility that Mr. Helm was an owner of Lot 3. Because he has no personal right, title, or interest in Lot 3 and he has no standing to represent PPI in litigation, he may be dismissed from this lawsuit.

### IV.  Conclusion

This is a simple contractual dispute. One of the defendants was a debtor in a Chapter 11 case arising after these contracts were entered into, but did not include the City of Bellevue or the contracts in its bankruptcy and gave no notice to the City of Bellevue. Accordingly, the City of Bellevue is not bound by the terms of PPI's confirmed reorganization plan, nor does the plan discharge PPI's obligation to the City of Bellevue. The City of Bellevue may pursue whatever rights and remedies it has against PPI to enforce that obligation. In addition, the contracts are not executory contracts. Even if they were, they were deemed rejected as part of the bankruptcy process and the City of Bellevue may pursue whatever rights and remedies it has against PPI. The decision by the city council to reject the defendants' non-tort claim is final and may not be relitigated in a court proceeding. The defendant PPI has not defended itself in this case, and default judgment should be

entered against it. The defendant Howard Helm is not a proper party defendant, and should be dismissed from the case.

Accordingly, I respectfully recommend to the United States District Court that it remand this case to the District Court of Sarpy County for further proceedings where default judgment should be entered against PPI, and Mr. Helm should be dismissed from the case.

DATED: May 22, 2014.

Respectfully submitted,

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *Roger P. Cox
    Howard Helm
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.